**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

ROBERT LEWIS GATSON, )
)
Plaintiff, )
)
v. ) C.A. No. 17-1523-MPT
)
NANCY A. BERRYHILL, )
ACTING COMMISSIONER OF )
SOCIAL SECURITY, )
)
Defendant. )

**MEMORANDUM**

**I.     INTRODUCTION**

This action arises from the denial of plaintiff's claim for Social Security benefits.

On May 6, 2013, plaintiff filed an application for Social Security Disability Insurance

benefits ("DIB") under Title II of the Social Security Act ("the Act").[1]  In his application,

plaintiff alleged he was disabled on November 1, 2012, due to left hand nerve damage.[2]

The claim was denied initially on August 6, 2013, and upon reconsideration on March

20, 2014.[3]  Following the denials, plaintiff requested a hearing before an Administrative

Law Judge ("ALJ").[4]  The hearing occurred on May 17, 2016, with ALJ Bonnie Kittinger.[5]

At the hearing, testimony was provided by plaintiff and impartial vocational expert

Christopher Rymond.[6]  On, June 14, 2016, ALJ Kittinger issued a decision denying

---

[1] D.I. 13 at 1.
[2] D.I. 15 at 1.
[3] D.I. 9-2 at 10.
[4] *Id.*
[5] *Id.*
[6] *Id.*

plaintiff's claim.[7]  Plaintiff requested review of the decision by the Appeals Council, which denied the review on September 11, 2017.[8]  He then filed a timely appeal with this court.[9]  Presently before the court are the parties' cross motions for summary judgment.[10]  For the reasons that follow, the court will grant defendant's motion.

## II.    BACKGROUND

Plaintiff was born on November 17, 1955.[11]  He has a high school education and has not worked full time since 2011.[12]  Plaintiff received unemployment benefits for approximately one year after being laid off, and claimed he stopped looking for employment after his left hand was injured in 2012.[13]

The ALJ found that plaintiff has physical and mental impairments, that are both severe and nonsevere.[14]  Plaintiff's severe impairments include:  complex regional pain syndrome vs. reflex sympathetic dystrophy and degenerative joint disease.[15]  His nonsevere impairments include:  possible cerebrovascular accident, transient ischemic attack, and/or seizure, hypertension, asthma, degenerative disc disease, and depression.[16]  Despite his impairments, the ALJ found that plaintiff can perform and return to past relevant work as a loan clerk/credit analyst, or an insurance claims clerk.[17]

---

[7] *Id* at 21.
[8] D.I. 13 at 2.
[9] *Id.*
[10] D.I. 12 and D.I. 14.
[11] D.I. 9-2 at 39.
[12] *Id.* at 39 and 41.
[13] *Id.* at 42.
[14] *Id.* at 12.
[15] *Id.*
[16] *Id.*
[17] *Id.* at 21.

To be eligible for disability benefits, plaintiff must not only demonstrate he is disabled within the meaning of §§§ 216(I), 223(d), and 1614(a)(3)(A), but additionally, that he meets the insured status requirements of §§ 216(I) and 223.[18]  Plaintiff has met the requirements for coverage under §§ 216(I) and 223, and his earnings records show he has acquired sufficient quarters of coverage to remain insured through December 31, 2016.[19]  The remaining issue, is whether plaintiff is disabled under the Act.

### A.    Evidence Presented

Plaintiff last worked for Chase Bank in 2011.[20]  He received unemployment, and stopped searching for additional employment due to chronic pain and extensive nerve damage in his left hand.[21]  Plaintiff alleged he was disabled on November 1, 2012.  On November 22, 2012, he went to the Emergency Room ("ER") for back pain and spasms.[22]  A nurse attempted to administer an IV but encountered problems with a vein, which allegedly precipitated his left hand impairments.[23]  On December 18, 2012, plaintiff returned to the ER and was diagnosed with left hand superficial thrombophlebitis following a VS VDOP of the left arm, neck, and wrist.[24]  He was prescribed Ibuprofen, which was changed to Mobic, 15 mg daily, and Percocet as needed for pain.[25]

On January 22, 2013, plaintiff met with his primary care physician, Matthew

---

[18] *Id.*
[19] *Id.*
[20] *Id.* at 14.
[21] *Id.*
[22] D.I. 13 at 7 and D.I. 9-16, Ex. 25F at 672-92.
[23] *Id.* and D.I. 9-2 at 15.
[24] D.I. 9-2 at 15, D.I. 13 at 7, and D.I. 9-16, Ex. 25F at 693-712.
[25] *Id.*

Jacobson, M.D., for pain of the left dorsal hand and swelling with palpable lumps, worsening at night or with increased use.[26]  An EMG of the left hand showed mild carpal tunnel syndrome and radicular symptoms up the left arm.[27]  Plaintiff was diagnosed with phlebitis thrombophlebitis and instructed to keep his hand elevated and minimal use.[28]

He returned to the ER in February, with pain in his left hand, and was examined by Todd Harad, M.D.[29]  Dr. Harad agreed with the ongoing treatment of Joseph Thornton, M.D., a hand surgeon that plaintiff saw twice for evaluation of his hand pain.[30]  Dr. Thornton ordered an MRI which revealed mild tenosynovitis of the second extensor compartment of the wrist, recommended therapy, and the hand to be splinted, and to see another hand surgeon and a neurologist.[31]  At this time, plaintiff was offered to return to work, but rejected the job offer.  He claimed he was unable to work due to his hand condition.[32]  Dr. Jacobson reported plaintiff had not been elevating his hand or minimizing use as advised.[33]  Plaintiff attended physical therapy three times a week, and maintained his hand felt "pretty good" in the mornings, but worsened as usage increased and the day progressed.[34]

Dr. Jacobson's treatment records from April 2013 indicate that plaintiff had continued left-hand soreness and nodules over the dorsal hand and spasms even with

---

[26] D.I. 13 at 7 and D.I. 9-7, Ex. 1F at 253-55.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] D.I. 13 at 7, D.I. 9-15, Ex. 24F at 671.
[31] *Id.* at 7 and at 298.
[32] D.I. 9-2 at 15.
[33] *Id.*
[34] D.I. 9-2 at 15 and D.I. 9-7, Ex. 1F.

minimal use.[35]  Further, plaintiff was taking care of his elderly mother, which made it difficult to avoid using his hand.[36]

In 2013, Anne Mack, M.D. reevaluated plaintiff with a nerve conduction study of his right upper and left lower extremity to evaluate for peripheral neuropathy.[37]  An examination revealed decreased sensation in his left upper extremity, but sensation was intact in his right upper extremity.[38]  Additionally, his lower extremities showed sensation intact to light touch, strength at 5/5 throughout, with normal nerve conduction studies, and asymptomatic in the extremities studied.[39]  There was no definite evidence of right carpal tunnel, and neurologic evaluation of the upper extremities showed sensation was decreased in his left second through fifth digits.[40]  Further, a screening electromyography done of the left extremity was normal, and showed no evidence of a left cervical radiculopathy or myopathy.[41]

Plaintiff underwent an MRI of his left hand which showed no abnormality within the metacarpals or proximal phalanges.[42]  MRI of the left wrist showed no acute osseous abnormality, mild tenosynovitis of the second extensor compartment and no findings of an abcess or osteomyelitis.[43]  Dr. Mack informed Drs. Thornton and Jacobson that the evidence of left median nerve entrapment at the wrist was consistent

---

[35] *Id.* and D.I. 13 at 8.
[36] *Id.*
[37] D.I. 9-2 at 15, D.I. 9-7, Ex. 2F at 263-69, and D.I. 9-13, Ex. 11F at 528-38.
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42]  D.I. 9-7-9-9, Ex. 3F-4F at 270-348, and D.I. 9-11, Ex. 6F at 398-459.
[43] *Id.*

with left carpal tunnel syndrome of mild severity.[44]  Plaintiff started physical therapy, was wearing a splint and began taking Neurontin.[45]

In May 2013, plaintiff complained physical therapy at ATI was not helping.[46]  On June 3, 2013, plaintiff was examined by J. Douglas Patterson, M.D.[47]  He noted that plaintiff had altered sensibility in the long, ring and small fingers, more prominent in the ring and long, with loose intrinsics and subluxation to the tendons in his long and ring digits.[48]  Dr. Patterson recommended therapy and possible cortisone injections.[49]  In July 2013, he recommended more physical therapy and to stop narcotics.[50]  In August, he diagnosed plaintiff with carpel tunnel syndrome by the nerve study, but plaintiff had negative Durkin's and Phalen's, and his symptoms were far from classic for carpal tunnel syndrome.[51]  Plaintiff was prescribed Cymbalta and told to use Neurontin as needed.[52]

In June 2013, Dr. Jacobson reported plaintiff was feeling mentally drained and depressed, which was impacted by taking care of his mother, who had dementia.[53]  His sister had helped prior to receiving Hospice care for her metastatic cancer.[54]

Plaintiff's medical records from Christiana Care Health Service in 2013 showed

---

[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] D.I. 13 at 7 and D.I. 9-10 at 349-60.
[48] *Id* and D.I. 9-12, Ex. 7F at 482-93.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*

no evidence of deep vein thrombosis in the left upper extremity.[55]  He underwent thirty-two sessions of physical therapy through August, 2013, but claimed no improvement since February.[56]  He maintained he had increased pain in the dorsal left hand with activities, increased stiffness in his fingers, soreness at instrinsics and around the nodules.  Further, he had difficulty with zippers and buttons, holding utensils, opening doors, opening and closing lids, and washing his face or hands.[57]

After twelve sessions of physical therapy related to the thoracic outlet of the left extremity, plaintiff returned to Dr. Patterson.[58]  Drs. Patterson and Jacobson agreed that a neurology referral was the best option.[59]  In September 2013, plaintiff began treatment with neurologist Lee Dresser, M.D., who treated him through February 2016.[60]  Dr. Dresser reported plaintiff had weakness of external rotation and abduction of the left shoulder in September 2013, and noted increased pain with activity in November 2013.[61]  Plaintiff was referred to pain management, considered for possible left stellate ganglion block.  Dr. Dresser also noted reflex sympathetic dystrophy of the left extremity.[62]

Plaintiff was referred to Dr. Asit Patel, who examined him on December 19, 2013.[63]  Dr. Patel reported plaintiff ambulated with antalgic gait due to evident back

---

[55] *Id.*
[56] D.I. 13 at 9 and D.I. 9-11, Ex. 6F at 367.
[57] *Id.*
[58] D.I. 13 at 9 and D.I. 9-12, Ex. 7 at 482.
[59] *Id.*
[60] D.I. 9-12, Ex. 8-9F at 495-510.
[61] *Id.* at 503.
[62] D.I. 9-13, Ex. 14F at 556-58.
[63] *Id.*

pain, and smoking cessation was discussed.  He informed plaintiff to continue to use his hand brace and glove to decrease pain and swelling.[64]  Plaintiff was offered a stellate ganglion block, but declined because he was afraid, stating he would just apply for disability.[65]  Dr. Patel diagnosed plaintiff with pain in limb, reflex sympathetic dystrophy of the upper limb and chronic pain.[66]  Plaintiff underwent a right axillary nerve block, but claimed the relief provided lasted onlyone and one-half days.[67]

    In January and March 2014, Dr. Dresser found that plaintiff continued to be medically unable to work using his left hand, and would be unable to return to a job that required him to type with his left hand.[68]  During a visit in March 2014, Dr. Dresser reported that plaintiff received two injections by Dr. Patel.[69]

    Plaintiff returned to the ER again in August 2014 for numbness in his right arm, with onset of pain in both upper extremities.[70]  Dr. Dresser diagnosed plaintiff with TIA and cerebral infarction without residual deficits and ordered an MRI and MRA.[71]  In December, plaintiff's right arm numbness worsened with trembling twice a week, always in the morning.[72]  Dr. Dresser diagnosed abnormal involuntary movements, RSD and acute but ill-defined cerebral vascular disease.[73]

---

[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] D.I. 9-18, Ex. 28F at 783-828.
[71] *Id.*
[72] *Id.*
[73] *Id.*

On April 21, 2015, plaintiff returned to the ER because of right arm shaking.[74]  He reportedly had thirty to sixty seconds of jerking, shaking and inability to use his right arm and leg.[75]  During that time, he had two strong spells and perhaps eight-weak ones in the past two weeks.[76]  He continued smoking a pack of cigarettes a day, had a blood pressure of 139/76, and a brain MRI showed decreased signal in the left middle cerebral artery with less prominent branching.[77]  Plaintiff's episodes of right arm shaking were characterized as compatible with focal seizures.[78]

A CT angiography of his brain showed the left middle asymmetrical cerebral artery decreased in size.[79]  There was no evidence of a focal occlusion or any aneurysm.[80]  A MRI of the brain was within normal limits for his age; the diagnosis was embolic stroke and left parietal stoke due to a high-grade left cavernous carotid stenosis.[81]  On May 7, 2015, plaintiff returned to the ER due to a possible seizure.[82]  Later in May, Dr. Dresser prescribed Keppra 500 mg. twice daily, and noted that plaintiff had not suffered a seizure since being placed on the medication.[83]

On July 2, 2015, Dr. Jacobson completed a physical RFC questionnaire, reporting that the emotional factors of depression and anxiety contributed to the severity

---

[74] *Id., Ex. 29F at 830-77.*
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*

of plaintiff's symptoms and functional limitations.[84] His pain and symptoms were constantly severe enough to interfere with attention and concentration needed to perform even simple work tasks and he was incapable of low stress jobs.[85] Dr. Jacobson noted plaintiff was able to walk two city blocks without rest or severe pain, stand fifteen minutes at a time, stand/walk less than two hours and sit for more than two hours for a total of at least six hours.[86]

Dr. Jacobson noted that plaintiff requires a job that permitted shifting positions from sitting, standing or walking and he would require unscheduled breaks.[87] Further, plaintiff could occasionally lift ten pounds, and rarely twenty pounds, but did not require a cane or other assistive device for walking/standing.[88] Finally, plaintiff would rarely be able to twist, stoop/bend, crouch/squat, or climb stairs, and he has significant limitations with reaching, handling or fingering.[89] Plaintiff would experience both good and bad days, and be absent more than four days per month because of his impairments or treatment.[90]

Charla Phoenix, PA-C, of Wilmington Neurology Consultants performed a physical RFC questionnaire on July 30, 2015.[91] She reported plaintiff was diagnosed with a stroke, complex partial seizures, and reflex sympathetic dystrophy.[92] Further, he

_____

[84] D.I. 9-13, Ex. 16F at 562-66.
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] D.I. 9-13, Ex. 17F at 567-71.
[92] *Id.*

had severe pain in his left hand/fingers/arm, dizziness, stiffness and involuntary body movements.[93]  She noted plaintiff's pain would frequently interfere with attention and concentration needed to perform simple work tasks and he was incapable of even low stress jobs.[94]

Plaintiff began counseling with licensed professional counselor, Elijah Butler, for depression in July 2015.[95]  Mr. Butler reported fatigue, anger, depression and stress as plaintiff's mental health problems.[96]  His self-care skills were intact and unimpaired, as was his domestic skills.[97]  He continued to have normal relationships with family and friends, and considerable stress resulted from caring for his mother.[98]  However, in December 2015, plaintiff began receiving help from a nursing agency.[99]

In 2016, plaintiff asked Mr. Butler to complete disability forms.[100]  He noted plaintiff had limited to poor mental abilities, adjustment disorder aptitudes, could only perform unskilled work, and had a low IQ or reduced intellectual functioning.[101]  Further, plaintiff had three or more episodes of decompensation within twelve months, each lasting at least two weeks, and he would likely be absent from work more than four days per month due to his impairments or treatment.[102]

On March 1, 2016, plaintiff suffered a stroke and was hospitalized for three

---

[93] *Id.*
[94] *Id.*
[95] D.I. 9-15, Ex. 23F at 635-69.
[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*

days.[103]  His complaints in the ER complaining were numbness and weakness on his right side and speech difficulties.[104]  He was diagnosed with embolic stroke and left parietal stroke from high grade left cavernous carotid stenosis, as well as, chronic neuropathic pain, history of seizures and chronic back pain.[105]  Plaintiff's history indicated his first stroke occurred in 2014, with residual right-hand weakness causing the grip of his right hand being weaker than the left since January 2016.[106]

Plaintiff is currently prescribed a number of medications, including:  Cymbalta, Keppra, Lotrel, Lipitor, Plavix, Xanex, Abilify, Methadone, Oxycodone, and Aspirin.[107] Plaintiff's medical file was also reviewed by nonexamining medical consultants, Dr. Shane and Dr. Shaffzin in July 2013 and March 2014, who both agreed that plaintiff was not disabled and could perform past relevant work.[108]

### B.    Hearing Testimony

#### 1.    Plaintiff's Testimony

At the administrative hearing on May 17, 2016, plaintiff testified to his background, work history, and alleged disability.[109]  Plaintiff is sixty-two years old, single, and has an adult daughter and three grandchildren.[110]  He has a high school education.[111]  Plaintiff testified that his driving abilities are limited, and he has not

---

[103] D.I. 9-14, Ex. 19F at 583-625.
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] D.I. 9-6, Ex. 11E at 239.
[108] D.I. 9-3, Ex. 1A-3A at 69-93.
[109] D.I. 9-2 at 36-68.
[110] *Id.* at 39-40.
[111] *Id.* at 39.

traveled out of state since November 2012.[112]  He further testified he has not worked

since being laid off in 2011, and received unemployment benefits for approximately one

year.[113]  He maintained that he attempted to look for employment, but stopped after his

hand injury.[114]

Plaintiff testified that during his ER visit on November 22, 2012, the nurse

struggled starting the IV and ended up popping his vein and damaging the nerves

underneath the vein and vein area.[115]  He stated that he continues to smoke, but has cut

back to a pack of cigarettes per week.[116]  He testified to experiencing chronic left hand

pain, which has been diagnosed as complex regional pain syndrome II.[117]

Plaintiff maintained that his pain is very severe, and that he suffered a stroke on

his right side, resulting in weakness on this side.[118]  He testified he is not able to brush

his teeth or tie his shoes with his right hand.[119]  Further, he is unable to write his name

or do other simple tasks.[120]  Plaintiff treats at Dynamic Therapy for his left hand

problems and for his stroke, but has not attended recently before the Administrative

Hearing because his mother's death.[121]

Plaintiff testified that he is able to lift five to ten pounds, but ten pounds is

---

[112] *Id.* at 40-41.
[113] *Id.* at 41-42.
[114] *Id.* at 42.
[115] *Id.*
[116] *Id.* at 43.
[117] *Id.* at 45.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *Id.* at 45-47.

pushing it.[122]  He cannot stand for long periods due to pain in the lower lumbar region, and he can walk only two or three blocks at a time.[123]  Plaintiff can stand for twenty to thirty minutes before he needs to sit down.[124]  He testified he tries to help out with the yard, vacuum, mopping the kitchen and bathroom floors, but is limited in what he can do, and does not have help.[125]  Before his mother passed away, aides assisted with some chores and his mother's care.  Additionally, friends and family helped, but have not done so recently.[126]

On the day of the Administrative hearing, plaintiff testified that his pain level was "maybe two to three", but after being in "this cold building, it's probably six, seven, heading toward an eight now right as we speak."[127]  The pain plaintiff was referring to was from his left hand.  He testified he had not taken any pain medicine because he "took all [his] medicines except the medicines that [he] thought that play a part in making [him] tired," and did not take the prescribed Xanax, Percocet, or Methadone.[128]  He further testified he used the keyboard at work between seven and seven and a half hours in an eight hour workday, but is now unable to do so for twenty minutes.  When he uses his left hand, "it always feel[s] worse."[129]

---

[122] *Id.* at 49
[123] *Id.*
[124] *Id.*
[125] *Id.* at 51-52.
[126] *Id.* at 54-55.
[127] *Id.*
[128] *Id.*
[129]d *Id.* at 57.

## 2.    Vocational Expert Testimony

Testimony was provided by vocational expert, Christopher Rymond.[130]  Mr. Rymond received his Master's of Vocational Rehabilitation Counseling from the University of Kentucky, and was certified by the Commission on Rehabilitation Counselor Certification in 2009.[131]  He has worked as a Vocational Rehabilitation Specialist and a vocational expert for the Social Security Administration.[132]  Mr. Rymond provides classification of employment and expert court testimony regarding jobs in local, regional, and national economies, as well as the effects specific physical and mental limitations may have on the availability of employment.[133]

Mr. Rymond classified plaintiff's work as a credit analyst.[134]  He reported that a credit analyst is skilled work per the DOT, at a SVP of 7, with sedentary exertion.[135]  He further maintained this work may have started as a semiskilled position, but over the years, became a skilled position.[136]  Mr. Rymond also characterized plaintiff's previous work history as a salesclerk, loan clerk, and insurance claim clerk.[137]

Mr. Rymond addressed the hypothetical situations posed by the ALJ.  The ALJ asked whether an individual of plaintiff's age, education and work history, could perform work at a light exertional level, and whether that same individual could:

occasionally life twenty pounds, could frequently lift ten pounds, could

---

[130] D.I. 9-2 at 59-65.
[131] D.I. 9-6 Ex. 12E at 240.
[132] *Id.* at 241.
[133] *Id.*
[134] *Id.* at 61.
[135] *Id.*
[136] *Id.*
[137] *Id.*

stand and walk up to six hours and sit every six hours in an eight-hour workday, could occasionally push and pull with the left upper extremity, occasionally crawl, but should not ever climb ladders, ropes, or scaffolds, and could occasionally reach in all directions overhead and front and laterally with the left upper extremity, also would need to avoid concentrated exposure to vibration and hazards such as dangerous machinery and unprotected heights. [138]

Mr. Rymond testified that these limitations allowed for work as a credit analyst, a skilled work position, with occasional handling, fingering, and feeling, and only occasional reaching in all directions with the left, non-dominant upper extremity.[139] Further, employment as a loan clerk, insurance claims clerk, and salesclerk could not be performed as plaintiff described, but could possibly be performed within the range of these jobs.[140]  Additionally, Mr. Rymond testified that:

any discussion herein of issues not directly addressed by the DOT such as differences in reaching or handling would be based upon my experiences and training . . . as well as my observation as to how jobs are typically performed and the tolerances and accommodations I feel most employers would be willing to make.  Further, any variation I may have made within classifying the claimant's past work is based on the claimant's description of his work activities both here and in the record as well as my understanding of DOT. . . .[141]

### C.    ALJ's Finding of Facts and Conclusions of Law

Based on plaintiff's application for a period of disability and disability insurance benefits protectively filed on February 6, 2014, the ALJ found plaintiff as not disabled under sections 216(I) and 223(d) of the Social Security Act.[142]  The ALJ's disability decision from the 2016 hearing, are summarized as follows:

---

[138] *Id.* at 62-63.
[139] *Id.* at 63.
[140] *Id.* at 63-64.
[141] Id. at 66.
[142] D.I. 9-2 at 21.

16

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.   The claimant has not engaged in substantial gainful activity since November 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq*).

3.   The claimant has the following severe impairments: complex regional pain syndrome vs. reflex sympathetic dystrophy and degenerative joint disease (20 CFR 404.1520©).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the Full Range of light work as defined in 20 CFR 404.1567(b). The claimant is able to life/carry twenty pounds occasionally and ten pounds frequently; and he is able to stand/walk six hours and sit at least six hours in an eight-hour workday. He is able to occasionally push/pull with his left upper extremity, occasionally crawl and occasionally reach in all directions with his left upper extremity; but he should not climb ladders, ropes or scaffolds. He should avoid concentrated exposure to vibration and hazards, such as dangerous machinery and unprotected heights.

6.   The claimant is capable of performing past relevant work as a Loan Clerk/Credit Analyst, Insurance Claims Clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2012, through the date of this decision (20 CFR 404.1520(f)).[143]

## III.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

---

[143] *Id.* at 12-21.

Each party moved for summary judgment.[144]  In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the nonmoving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[145]  If there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[146]

This standard does not change merely because there are cross-motions for summary judgment.[147]  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[148]

"The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[149]

## B.    Court's Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of the ALJ's decision by the district court.  The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not include substantial evidence to support the ALJ's decision.  The Commissioner's factual decisions are

---

[144] D.I. 12 (Plaintiff's motion for summary judgment); D.I. 14 (Defendant's motion for summary judgment).

[145] *Reeves v. Sanderson Plumbing, Prods., Inc.*, 530 U.S. 133, 150 (2000).

[146] *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

[147] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[148] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[149] *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

upheld if supported by substantial evidence.[150]  Substantial evidence means less than a

preponderance of the evidence, but more than a mere scintilla of evidence.[151]  As the

United States Supreme Court has found, substantial evidence "does not mean a large

or significant amount of evidence, but rather such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."[152]

In determining whether substantial evidence supports the Commissioner's

findings, the court may not undertake a de novo review of the Commissioner's decision

and may not re-weigh the evidence of record.[153]  The court's review is limited to the

evidence that was actually presented to the ALJ.[154]  The Third Circuit has explained that

a:

> single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it is overwhelmed by other evidence,
> particularly certain types of evidence (e.g., evidence offered by treating
> physicians) or if it really constitutes not evidence but mere conclusion.[155]

Thus, the inquiry is not whether the court would have made the same

determination, but rather, whether the Commissioner's conclusion was reasonable.[156]

Even if the court would have decided the case differently, it must defer to the ALJ and

affirm the Commissioner's decision so long as that decision is supported by substantial

---

[150] 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Medical Center v. Heckle*, 806 F .2d 1185, 1190 (3d Cir. 1986).

[151] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

[152] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

[153] *Monsour*, 806 F.2d at 1190.

[154] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001)

[155] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

[156] *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

evidence.[157]

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision."[158]  In *Securities & Exchange Commission v. Chenery Corp.*, the Supreme Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."[159]  The Third Circuit has recognized the applicability of this finding in the Social Security disability context.[160]  Thus, this court's review is limited to the four corners of the ALJ's decision.[161]

### C.    ALJ's Disability Determination Standard

The Supplemental Social Security Income (SSI) program was enacted in 1972 to assist "individuals who have attained the age of 65 or are blind or disabled" by setting a minimum income level for qualified individuals.[162]  A claimant – in order to establish SSI eligibility – bears the burden of proving that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

---

[157] *Monsour*, 806 F .2d at 1190-91.
[158] *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).
[159] *Sec. & Exch. Comm'n v. Chenery Corp.,* 332 U.S. 194, 196 (1947).
[160] *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001).
[161] *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005).
[162] *Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982 ed.)).

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than twelve months."[163]  Moreover, "the physical or mental impairment or impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy."[164]  Furthermore, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are evidenced by medically acceptable clinical and laboratory diagnostic techniques.[165]

### 1.    Five-Step Test.

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled.[166]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.
> Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  The

---

[163] 42 U.S.C. § 423(d)(1)(A).
[164] 42 U.S.C. § 423(d)(2)(A).
[165] 42 U.S.C. § 423(d)(3).
[166] 20 C.F.R. §416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).

claimant bears the burden of demonstrating an inability to return to her past relevant work. If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.[167]

If the ALJ determines that a claimant is disabled at any step in the sequence, the analysis ends.[168]

## 2. Weight Afforded Treating Physicians

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."[169] Moreover, such reports will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence on record.[170]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[171] If the ALJ rejects the treating physician's

---

[167] *Plummer*, 186 F.3d at 427.
[168] 20 C.F.R § 404.1520(a)
[169] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)
[170] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
[171] *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429).

assessment, he may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[172]  If an opinion is rejected, then the ALJ must provide an explanation for the rejection.  However, the explanation need not be exhaustive, but rather "in most cases, a sentence or short paragraph would probably suffice."[173]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion; rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case.[174]  Therefore, only the ALJ can make a disability determination.

### 3.      Evaluation of Subjective Accounts of Pain[175]

Statements about the symptoms alone never establish the existence of any impairment or disability.[176]  The Social Security Administration uses a two-step process to evaluate existence and severity of symptoms.

### a.      Step One, Existence of Pain

First, the ALJ must find a medically determinable impairment – proven with medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the claimant's symptoms.  Otherwise, the ALJ cannot find the

---

[172] *Plummer*, 186 F.3d at 429.
[173] *Cotter v. Harris,* 650 F.2d 481, 482 (3d Cir. 1981).
[174] *See* 20 C.F.R. § 416.927 (e)(1).
[175] *See* 20 C.F.R §§ 416.928-29; *see also* SSR 96-7p.
[176] A symptom is an individual's own description of physical or mental impairments such as pain, fatigue, shortness of breath and other complaints.  *see* SSR 96-7p.

applicant disabled, no matter how genuine the symptoms appear to be.

This step does not consider the intensity, persistence, and limiting effects of the symptoms on the claimant:  it only verifies whether a medical condition exists that could objectively cause the existence of the symptom.

Analysis stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*.

### b.    Step Two, Severity of Pain

At step two, the ALJ must determine the extent to which the symptoms limit the claimant's ability to do basic work activities.  At this step, the ALJ must consider the entire record, including medical signs, laboratory findings, the claimant's statements about symptoms, any other information provided by treating or examining physicians and psychologists, and any other relevant evidence in the record, such as the claimant's account of how the symptoms affect his activities of daily living and ability to work.[177]

Where more information is needed to assess a claimant's credibility, the ALJ must make every reasonable effort to obtain available information that would shed light on that issue.  Therefore, the ALJ must consider the following factors relevant to symptoms, only when such additional information is needed:

(I)  The applicants' account of daily activities;

(ii)  The location, duration, frequency, and intensity of pain or other symptoms;

---

[177] 20 C.F.R. § 404.1529.

(iii)  Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication the applicant takes or has taken to alleviate pain or other symptoms;

(v)  Treatment, other than medication, the applicant receives or has received for relief of pain or other symptoms;

(vi)  Any measures the applicant uses or has used to relieve pain or other symptoms (e.g., lying flat, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)  Other factors concerning functional limitations and restrictions due to pain or other symptoms.[178]

### 4.    Factors in Evaluating Credibility[179]

A claimant's statements and reports from medical sources and other persons with regard to the seven factors, noted above, along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility.

Consistency with the record, particularly medical findings, supports a claimant's credibility.  Since the effects of symptoms can often be clinically observed, when present, they tend to lend credibility to a claimant's allegations.  Therefore, the adjudicator should review and consider any available objective medical evidence concerning the intensity and persistence of pain or other symptoms in evaluating the

---

[178] 20 C.F.R. § 404.1529
[179] SSR 16-3p.

claimant's statements.

Persistent attempts to obtain pain relief, increasing medications, trials of different types of treatment, referrals to specialists, or changing treatment sources may indicate that the symptoms are a source of distress and generally support a claimant's allegations. An applicant's claims, however, may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of the analysis. Such opinions are not given controlling weight. However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability. The ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain – provide sufficiently specific reasons based on the record – to the claimant and any subsequent reviewers, the weight afforded to the claimant's statements and the reasons therefore.

The law recognizes that the claimant's work history should be considered when

evaluating the credibility of his testimony or statements.[180]  A claimant's testimony is accorded substantial credibility when he has a long work history, which demonstrates it is unlikely that, absent pain, he would have ended employment.[181]

### 5.     Medical Expert Testimony

The onset date of disability is determined from the medical records and reports and other similar evidence, which requires the ALJ to apply informed judgment.[182]  "At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred."[183]

## IV.    DISCUSSION

### A.     Parties' Contentions

In his appeal, plaintiff argues the ALJ's evaluation of the opinion evidence is insufficient as a matter of law and contrary to the regulations, Agency policy and Third Circuit precedent.[184]  He contends that the opinions of his treating physicians establish greater limitations than set forth in the RFC and, pursuant to Agency authority, he is disabled.[185]  Further, he maintains that the ALJ failed to provide good, specific,

---

[180] 20 C.F.R. § 404.1529(a)(3)

[181] *Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984)(citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981)).  In *Podedworny*, the claimant worked for thirty-two years as a crane operator for one company.  He had a ninth grade education and left his employment after the company physicians determined that his symptoms of dizziness and blurred vision prevented him from safely performing his job.

[182] SSR 83-20.

[183] *Id.*

[184] D.I. 13 at 12.

[185] *Id.* at 13-14.

supported reasons for rejecting the treating opinions.[186]  Additionally, he argues that the ALJ's credibility assessment is generally flawed based on the aforementioned issues, and specifically because it fails to acknowledge plaintiff's stellar work history.[187]

Alternatively, defendant maintains the ALJ complied with the regulations when weighing the medical evidence, and plaintiff's work history would not have changed the outcome of this case.[188]

## B.    Disability Analysis

Title II of the Social Security Act, 42 U.S.C. § 423(a)(I)(D), "provides for the payment of insurance benefits" to those who contributed to the program and suffer from a physical or mental disability.[189]  In order to qualify for disability insurance benefits, a claimant must establish he was disabled prior to the date he was last insured.[190]  A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least twelve months.[191]  To be disabled, the severity of the impairment must prevent return to previous work, and considering age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy."[192]

---

[186] *Id.* at 14-19.
[187] *Id.* at 19-20.
[188] D.I. 15 at 7-12.
[189] *Bowen*, 482 U.S. at 140.
[190] 20 C.F.R. § 404.131.
[191] 42 U.S.C. §§ 423(d)(I)(A), 1382(c)(a)(3).
[192] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

As noted previously, in determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.[193] If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner does not review the claim further.[194]

When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.[195] If a claimant's impairments, either singularly or in combination, fail to meet or medically equal any listing, the analysis continues.[196] In the analysis through the five steps, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work.[197] A claimant's RFC is "that which an individual is still able to do despite the limitations caused by [his] impairment(s)."[198]

If the claimant is unable to return to his past relevant work, the Commissioner then determines whether the claimant's impairments preclude adjusting to any other available work.[199] At this final step, the burden is on the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past

---

[193] 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).
[194] 20 C.F.R. § 404.1520(a)(4).
[195] 20 C.F.R. § 404.1520(a)(4)(iii).
[196] 20 C.F.R. § 404.1520(e).
[197] 20 C.F.R. § 404.1520(a)(4)(iv); *see also Plummer*, 186 F.3d at 428.
[198] *Fargnoli*, 247 F.3d at 40.
[199] 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when claimant can adjust to other work); *see also Plummer*, 186 F.3d at 428.

work experience, and RFC before denying disability benefits.[200]  In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments, often through the assistance of a vocational expert.

### 1.    Weight Accorded to Medical Opinion Evidence

It is the exclusive responsibility of the ALJ to weigh the evidence in the record as a whole in making a disability decision.[201]  The evidence presented to the ALJ may contain differing medical opinions from both treating and non-treating physicians, as well as other testimony.[202]  Normally, the evidence presented by the treating physician is given controlling weight as that individual may be most acquainted with the medical history of the claimant.  However, in circumstances where the treating physician's opinion is not consistent with the record as a whole or is not well supported by "medically acceptable clinical and laboratory diagnostic techniques", an ALJ may reasonably accord little weight to the treating physician's opinion.[203]

Plaintiff argues that the ALJ failed to properly weigh the medical opinion from treating physicians Drs. Jacobson, Dresser and Fishman, and PA-C Phoenix.  However, the ALJ's decision regarding weight did not turn on whether the nature and severity of his impairments were well supported by medically acceptable clinical and laboratory diagnostic techniques, but rather on whether the opinion was inconsistent with the other substantial evidence in the record.  This court finds that the proper weight was given to

---

[200] *Id.*
[201] See 20 CFR 404.1527(e)(2).
[202] See 20 CFR 404.1512.
[203] See 20 CFR 404.1527.

the medical opinions of the treating physicians, and the evidence supports this decision.

### a. Treating Physicians

The ALJ considered the assessments of plaintiff's treating physicians, but assigned their opinions partial, relatively slight weight.  The ALJ maintained that their opinions were not supported by the objective documentation in their treatment records.  These opinions were inconsistent with plaintiff's demonstrated ability to serve as primary caretaker for his elderly mother, who had dementia and required assistance with bathing and daily activities.  The ALJ found the medical evidence did not substantiate the inability to perform light and sedentary work, such as the work plaintiff previously performed.  The ALJ further maintained that the conclusion that plaintiff is not disabled is supported by the opinions of the state agency medical and psychological consultants.

The ALJ properly afforded slight weight to Dr. Jacobson's opinion, because of the inconsistency with PA-C Phoenix's treatment records.  On July 20, 2015, PA-C Phoenix performed a Physical RFC of plaintiff at Wilmington Neurology Consultants.  He was diagnosed with stroke, complex partial seizures, and reflex sympathetic dystrophy.  Plaintiff reported he had severe pain in his left hand, fingers, and arm, dizziness, stiffness, and involuntary body movements.  Ms. Phoenix noted his pain would frequently interfere with attention and concentration needed to perform simple work tasks making him incapable to perform low stress jobs.  Further, she reported that plaintiff would be able to sit for twenty to thirty minutes, stand or walk for ten to fifteen minutes at one time for a total of about two hours sitting and two hours standing/walking

in an eight hour workday.  Additionally, she maintained he could rarely lift ten pounds.

Under the disability determination standard, a statement by a treating source that a claimant is disabled is not a medical opinion.[204]  The ALJ is the only one with authority to decide whether plaintiff is disabled.  In other words, a finding of "disabled" by a treating physician does not equate to the definition of disabled under the Acts. Therefore, the treating medical opinions that plaintiff is disabled are not dispositive, and the ALJ did not err in reject it as a medical opinion.

### b.        State Agency Consultants

Plaintiff's medical file was reviewed by state agency consultants, Drs. John Shane and Lawrence Shaffzin.[205]  Dr. Shane reported that plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone.  He further noted that the assessment of the credibility of plaintiff's statements regarding symptoms considering the total medical and non-medical evidence were only partially credible.

Dr. Shane documented an RFC evaluation of plaintiff, reporting that he had external limitations due to his left hand.  Plaintiff could:  occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight hour day; sit for about six hours in an eight hour work day; his left upper extremity was limited with push/pull; he had postural limitations, and could never climb ladders, ropes, or scaffolds.  He further determined that plaintiff had possible left

---

[204] *See* 20 CFR 416.927(e)(1).
[205] D.I. 9-3, Ex. 1A-3A at 69-93.

upper extremity thrombophlebitis, which was equivocal at best. His right side was normal, but his left showed mild CTS and he was limited in reaching, handling, fingering, or feeling.

Dr. Shane maintained that the allegations lacked credibility and plaintiff not only had past relevant work, but his RFC showed he was able to perform past relevant work. He found that the evidence demonstrated that plaintiff had some limitations in performance of certain work activities; however these limitations would not prevent him from performing past relevant work as a senior credit analyst, and therefore plaintiff is not disabled.

Dr. Shaffzin agreed with Dr. Shane's determination of plaintiff, finding that he is not disabled and could generally perform past relevant work in the national economy. He maintained that the evidence showed some limitations in performance of certain work activities; however these limitations would not prevent him from performing past relevant work as a senior credit analyst.

## 2. The ALJ's Credibility Assessment

As stated above, a claimant's statements and reports from medical sources and other persons, along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility. However, the key component in the assessment of plaintiff's credibility is consistency between his testimony and the record. Plaintiff's claims may be less credible if the level or frequency of treatment is inconsistent with the degree of his complaints, or if the medical reports or records show noncompliance with prescribed

treatment.

The ALJ concluded plaintiff's testimony was not credible due to its inconsistency with other evidence in the record. The ALJ compared the record to plaintiff's testimony and concluded his "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however . . . [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible . . . ."[206] The ALJ found that plaintiff was not intentionally misrepresenting the severity of his impairments, and his decision to care for his mother was admirable, but the objective medical evidence does not substantiate inability to perform light and sedentary work, such as the work he previously performed.

Proper application of the credibility standard requires the ALJ's decision to clearly explain the weight afforded to the claimant's statements and his reasoning, by including sufficiently specific reasons from the record. As previously stated, the examples cited herein of his reasoning, clearly delineated in the decision suffice.

Plaintiff argues that the opinions of the state agency medical consultants should not have been afforded great weight. However, findings of fact by state agency medical and psychological consultants, other psychologists and physicians, and the opinions of non-examining physicians regarding the existence and severity of impairments and symptoms are part of the analysis. The ALJ considered the vocational expert's testimony, and also added limitations in plaintiff's favor to that assessment, in making the final determination regarding disability. The ALJ did not give the vocational expert's

_____

[206] D.I. 9-2 at 19.

opinion controlling weight, and therefore, did not err.

**V.     CONCLUSION**

Therefore, Plaintiff's Motion for Summary Judgment (D.I. 12) is denied; and

Defendant's Motion for Summary Judgment (D.I. 14) is granted.  An order consistent

with the findings in this memorandum shall follow.

December 4, 2018                                    /s/ Mary Pat Thynge
                                                   Chief U.S. Magistrate Judge